UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CONRAD SHIPYARD, L.L.C.<br>　　　Plaintiff<br><br>VERSUS<br><br>FRANCO MARINE 1, LLC,<br>FRANCO MARINE 2, LLC and<br>HARLEY MARINE SERVICES, INC.<br>　　　Defendants | CIVIL ACTION<br><br>NO.<br><br>SECTION<br><br>DIVISION |

**COMPLAINT**

**NOW INTO COURT,** through undersigned counsel, comes Conrad Shipyard, L.L.C., Plaintiff herein, and for its Complaint respectfully avers as follows:

**PARTIES**

**1.**

Plaintiff, Conrad Shipyard, L.L.C. ("Conrad"), is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal place of business in Morgan City, Louisiana.

**2.**

Defendant, Franco Marine 1, LLC ("FM1"), is a limited liability company organized and existing under the laws of the State of Washington, with its principal place of business in Seattle, Washington, and at all material times, was doing business in the State of Louisiana.

**3.**

Defendant, Franco Marine 2, LLC ("FM2"), is a limited liability company organized and

{B1534895.1}

existing under the laws of the State of Washington, with its principal place of business in Seattle, Washington, and at all material times, was doing business in the State of Louisiana.

**4.**

Defendant, Harley Marine Services, Inc. ("HMS"), is a corporation organized and existing under the laws of the State of Washington, with its principal place of business in Seattle, Washington, and at all material times, was doing business in the State of Louisiana.

**JURISDICTION AND VENUE**

**5.**

This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.00. Venue is proper in this district under 28 U.S.C. § 1391 because the contracts at issue between the parties contain a valid and enforceable forum selection clause designating this judicial district as a proper venue for resolution of claims.

**FACTUAL ALLEGATIONS**

**6.**

Conrad is a shipyard located in Morgan City, Louisiana, and from 2012 to 2016, it constructed a total of 23 vessels for HMS.

**7.**

Presumably for internal business reasons, including financing, HMS would nominate a separate but related entity to actually execute the contracts for the construction of these vessels. In fact, all of the 23 vessels constructed by Conrad for HMS between 2012 and 2016 involved contracts with entities other than HMS, yet it was undisputed that the vessels were being constructed for HMS and that HMS was responsible for the payment for the construction of the vessels as per the terms of the contracts.

**8.**

Names through which HMS contracted with Conrad between 2012 and 2016 included "Harley & Lela Franco," "Harley & Lela Franco Barge," "Harco Marine, LLC," and "ATB AssetCo2, LLC."

**9.**

Harley Franco, whose name is associated with many of these designated entities for contracting purposes, was and still is the majority owner of HMS, and was the primary contact with HMS in connection with the vessels constructed by Conrad for HMS between 2012 and 2016.

**10.**

HMS contacted Conrad in early 2017 for pricing for the construction of two anchor-handling tugs, which were identified as Hull C-1185 and Hull C-1186 ( the "Vessels").

**11.**

On March 2, 2017, Travis J. Aucoin, Bids and Proposals Manager for Conrad, submitted the formal price proposal for the construction of the Vessels to HMS, to the attention of Steve Carlson, who at the time was the Vice President of Engineering for HMS.

**12.**

The submission of the bid proposal by Conrad to HMS triggered several months of discussions between Conrad and HMS, which included discussions pertaining to pricing, financing, payment terms and other contractual and technical issues.

**13.**

At all times during the pre-contract discussions, HMS was represented by Harley Franco (who at the time was the Chief Executive Officer, President and Chairman of HMS), Mark

Stiefel (who at the time was Vice President, Contract Administration for HMS), Steve Carlson (who at the time was the Vice President of Engineering for HMS), Matthew Godden, (who at the time was the Senior Vice President and Chief Operating Officer for HMS), and Rod Gullickson (who at the time was the Vice President of Operations for HMS).

**14.**

From March 2017 to July 2017, Conrad and HMS continued to negotiate the details of the contracts for the construction of the Vessels. In an email dated July 25, 2017 from Mark Stiefel of HMS to Gary Lipely of Conrad, Stiefel, writing on behalf of HMS, stated that: "We look forward to entering into contracts for Hulls C-1185 and C-1186," and then proceeded to provide comments on the draft contracts that had been provided by Conrad.

**15.**

In the July 25, 2017 email from Stiefel, Stiefel also advised Conrad that the entities to be nominated to execute the contracts would be "Franco Marine 1, LLC" and "Franco Marine 2, LLC", which was consistent with the contractual arrangements related to the previous 23 vessels that Conrad had constructed for HMS between 2012 and 2016.

**16.**

Upon information and belief, FM1 and FM2 were created on July 24, 2017, one day prior to Mark Stiefel's email to Conrad dated July 25, 2017, advising that FM1 and FM2 would be the contracting parties and providing other comments to the draft contracts.

**17.**

Harley Franco was and is the majority owner of both FM1 and FM2 as well as the majority owner of HMS.

**18.**

While the parties were negotiating the final terms and conditions of the contracts for the

construction of the Vessels, HMS was simultaneously undergoing a financial restructuring and was in discussions with at least one lender about financing the project.

**19.**

Conrad was informed by HMS that the Vessels were to be dedicated to contracts for HMS' customer, Phillips 66. In order to assist HMS in having the Vessels constructed in time to meet the contractual obligations of HMS to Phillips 66, and with the understanding that HMS was finalizing financing arrangements with CAT Financing, Conrad agreed to proceed with the construction of the Vessels and the Vessel Construction Contracts related to Hull C-1185 and Hull C-1186 (the "Contracts") were executed on September 12, 2017, each with a price of $9,826,000.00, for a total amount for the Contracts of $19,652,000.00, excluding change orders.

**20.**

Harley Franco executed the Contracts on behalf of FM1, FM2 and HMS, and Harley Franco, along with Matthew Godden and Rod Gullickson, of HMS, were identified as individuals in the Contracts to whom notice should be provided.

**21.**

It is undisputed that FM1 and FM2 were created solely for contracting purposes so that the Contracts could be finalized and Conrad could proceed with the construction of the Vessels, between the time that HMS had secured financing for the Vessels from CAT Financing and the time when CAT Financing would fund the project following the completion of the financial restructuring of HMS.

**22.**

At no time prior to the execution of the Contracts or the commencement of the work in connection with the construction of the Vessels did anyone from HMS ever indicate to Conrad that HMS was not the responsible party, nor did anyone from HMS at any time express any

reservations to Conrad that the creation of FM1 and FM2 was done as a separate business venture for Harley Franco, or that Harley Franco (who at the time was the President, Chief Executive Officer and Chairman of HMS) did not have the authority to enter into the Contracts through FM1 and FM2 on behalf of HMS.

23.

Not only did no one from HMS advise Conrad that Harley Franco was proceeding with these transactions without the authority to do so on behalf of HMS, numerous representatives of HMS, most of whom held key officer positions, remained involved in discussions and were either the sender, recipient or were copied on most of the correspondence that was exchanged among Conrad, Harley Franco and HMS, including Mark Stiefel, Steve Carlson, Matthew Godden and Rod Gullickson, related to the negotiation, execution and administration of the Contracts, the commencement of the work and the securing of financing from CAT Financing.

24.

As further evidence that the construction of the Vessels was for HMS and that HMS was the real party in interest to the Contracts, HMS provided two winches for the Vessels as part of the "Owner-Furnished Equipment" as required by the Contracts.

25.

Not only did HMS provide the winches as "Owner-Furnished Equipment," it also negotiated with Conrad with respect to the costs associated with refurbishing the winches before they were installed on the Vessels.

26.

Even after the Contracts were executed and the construction of the Vessels commenced, representatives of HMS continued to be involved with the project, including discussions with

respect to technical details for the Vessels and instructions to Conrad as to the application of payments to Conrad invoices.

### 27.

HMS attended the project kick-off meeting, all change orders were submitted to and approved by HMS, HMS attended bi-weekly project status meetings, and all questions regarding design were handled by HMS.

### 28.

Approximately five (5) months after the commencement of construction, FM1, FM2 and HMS stopped making progress payments pursuant to the payment schedule in the Contracts.

### 29.

At the time payment stopped, CAT Financing had still not provided funding for the construction of the Vessels since HMS' financial restructuring had not been completed. Accordingly, Conrad and HMS began discussing alternative payment options which included, among other concessions, the possibility that Conrad would finance the project and adjustments could be made to the progress payment schedule.

### 30.

In July of 2018, around the time that a well-publicized internal dispute occurred within HMS, resulting in litigation involving Harley Franco, HMS, certain individuals at HMS, and an investor in HMS, CAT Financing officially dropped out as a potential financing source for the Vessels.

### 31.

Throughout the fall of 2018, Conrad continued to have discussions with HMS, primarily through Sterling Adlakha, HMS' Chief Financial Officer, pertaining to alternative financing options for the Vessels.

**32.**

HMS continued to update Conrad on nearly a weekly basis on HMS' efforts to secure alternative financing for the Vessels.

**33.**

In early October of 2018, HMS' Board approved of the efforts to continue to secure alternative financing and confirmed HMS' commitment with respect to the construction of the Vessels and its assumption of financial responsibility to make the payments to Conrad.

**34.**

HMS eventually selected Encina Capital, which following the performance of its own due diligence, approved the financing for the Vessels.

**35.**

Notwithstanding that it had secured financing for the Vessels, and confirmed its commitment to the construction of the Vessels and its responsibility to make payments to Conrad as it had contemplated and discussed with Conrad throughout the negotiation, execution and administration of the Contracts, HMS advised Conrad in late November of 2018 that it was interested in purchasing only one of the Vessels, which Encina Capital would finance, and which had been approved by HMS' board.

**36.**

On or about December 28, 2018, despite having secured financing and obtained Board approval for the purchase of one of the Vessels, the shareholders of HMS were not able to come to an agreement on the terms of the financing. Nevertheless, HMS advised Conrad that it still may be interested in purchasing one of the Vessels directly from Conrad, rather than to complete the transaction through FM1 and FM2, but for a discounted price.

**37.**

In early January of 2019, approximately fifteen (15) months after the commencement of construction, and despite ongoing discussions between Conrad and HMS as to alternative financing and payment arrangements, HMS advised Conrad that it would not be making any additional payments, that it did not intend to purchase either of the two Vessels, and that any future discussions should be between Conrad and Harley Franco on behalf of FM1 and FM2, as the parties to the Contracts.

**38.**

The position taken by HMS in an effort to distance itself from its obligations to Conrad under the Contracts is inconsistent with the long history of business dealings between HMS and Conrad, which now consists of the construction of 25 vessels, and that position disregards the active roles of key officers of HMS in connection with the negotiation, execution and administration of the Contracts, including Harley Franco, who at the time was the Chief Executive Officer, President and Chairman of HMS, and Matthew Godden, who at the time was the Senior Vice President and Chief Operating Officer of HMS.

**39.**

FM1 and FM2 were created solely for contracting purposes for the construction of the Vessels, and FM1, FM2 and HMS are collectively a single business enterprise, which have the same majority ownership, the same business address (which is the same address used for all of the other entities that executed contracts with Conrad for the construction of Vessels for HMS), the same management personnel, and were at all times represented by the same individuals at HMS in connection with the negotiation, execution and administration of the Contracts.

**40.**

The total contract price for Hull C-1185, including change orders, is $10,240,396. To date, FM1, FM2 and HMS have paid only $2,000,000.

**41.**

The total contract price for Hull C-1186, including change orders, is $10,139,837. To date, FM1, FM2 and HMS have paid only $491,200.

**42.**

Despite amicable demand, the amount currently outstanding for Hull C-1185 is $8,240,396 and the amount outstanding for Hull C-1186 is $9,648,637, for a total outstanding amount owed under the Contracts of $17,889,033, exclusive of interest at a rate of 8% per annum, as per the Contracts.

## CAUSES OF ACTION

### Count I (Breach of Contract Claim Against FM1, FM2 and HMS)

**43.**

Plaintiff, Conrad, re-alleges and incorporates by reference herein the allegations in Paragraphs 1-42 above as though fully set forth herein.

**44.**

FM1 and FM2 were the parties nominated to execute the Contracts by HMS.

**45.**

Although the Contracts are between Conrad and FM1 and FM2, FM1, FM2 and HMS were a single business enterprise for purposes of the Contracts for the construction of the Vessels, and FM1 and FM2 were merely instrumentalities for HMS for executing the Contracts and allowing the construction of the Vessels to commence, while HMS continued to explore its financing options.

**46.**

FM1 and FM2 were organized and controlled as instrumentalities of HMS such that those entities constituted a single business enterprise, as evidenced by the following:

a) Harley Franco was and is the majority owner of FM1, FM2 and HMS;

b) The negotiation, execution and administration of the Contracts were handled by representatives of HMS, and at no time did Conrad ever have any dealings with anyone from FM1 and FM2, which, upon information and belief, do not have any employees;

c) FM1, FM2 and HMS have the same office address;

d) Upon information and belief, FM1 and FM2 do not maintain separate bank accounts or accounting departments;

e) Upon information and belief, Harley Franco was paid a salary as President, Chief Executive Officer and Chairman of HMS, and was not paid a separate salary with respect to FM1 and FM2;

f) Upon information and belief, and at all times during the negotiation, execution and administration of the Contracts, FM1, FM2 and HMS appear to have displayed unified administrative control, and the business conducted by FM1 and FM2 was merely supplemental to the business of HMS with respect to the Contracts;

g) Upon information and belief, FM1 and FM2 had no separate business other than the execution of the Contracts on behalf of HMS.

**47.**

Harley Franco was directly involved in the creation and nomination of FM1 and FM2 for purposes of the Contracts, and as the President, Chief Executive Officer and Chairman of HMS

at that time, he was directly involved in the decision at HMS to proceed with the execution of the Contracts through FM1 and FM2, and had the apparent authority to make such business decisions and take such actions as necessary for HMS to proceed with the construction of the Vessels in that manner, and at no time did anyone else from HMS indicate that Harley Franco did not have such authority.

**48.**

To the Contrary, representatives of HMS never questioned or limited the apparent authority of Harley Franco and actually acted in a manner consistent with Harley Franco having such authority by working in conjunction with Harley Franco and being directly involved through all phases of the negotiation, execution and administration of the Contracts.

**49.**

FM1, FM2 and HMS were a single business enterprise for purposes of the Contracts with Conrad, and all three of those entities are liable to Conrad for breach of the Contracts, by failing to make the required payments to Conrad in accordance with the terms and conditions of the Contracts, and there are no grounds by which those payments should be offset or reduced.

### Count II (Detrimental Reliance Claim Against HMS)

**50.**

Plaintiff, Conrad, re-alleges and incorporates by reference herein, the allegations in Paragraphs 1-49 above as though fully set forth herein.

**51.**

Conrad proceeded with the execution of the Contracts and the commencement of construction of the Vessels based on the history of prior contracts with HMS, and with the assurance based on the statements and actions of key officers of HMS that HMS was a real party

in interest and was financially responsible for payment of the costs associated with the construction of the Vessels.

**52.**

If not for the historical relationship between the parties and the assurances made by representatives of HMS leading up to the execution of the Contracts and commencement of the construction of the Vessels, Conrad never would have entered into the Contracts and would not have commenced construction of the Vessels.

**53.**

Officials with HMS knew that representatives of Conrad would be comfortable dealing with HMS, based on both the historical relationship and the nature of the discussions leading up to and after the execution of the Contracts, such that Conrad was clearly relying on the fact that HMS would be responsible for making payments under the Contracts when it commenced construction of the Vessels.

**54.**

HMS's interest in the Contracts was even further established by HMS providing the winches as "Owner-Furnished Equipment" and discussing directly with Conrad the costs of refurbishing the winches before being installed on the Vessels, and at no time did HMS ever indicate that it was providing the winches on behalf of a third party and not as the owner of the Vessels.

**55.**

Conrad's reliance on the representations and assurances made by representatives of HMS was clearly reasonable, taking into account the historical relationship between the parties, the positions held within HMS by the individuals with whom Conrad dealt, and the failure of HMS to provide any indication to Conrad whatsoever that HMS was not the real party in interest and

that individuals with whom Conrad had been dealing were exceeding their authority, despite having ample opportunities over the course of nearly two years to do so.

### 56.

HMS is barred from now taking a position contrary to its prior acts, admissions, representations or silence.

### DAMAGES

### 57.

Plaintiff, Conrad, re-alleges and incorporates by reference herein the allegations in Paragraphs 1-56 above as though fully set forth herein.

### 58.

As a result of the actions and inactions of FM1, FM2 and HMS, as demonstrated in the preceding paragraphs, FM1, FM2 and HMS are liable to Conrad for the following damages, which continue to accrue:

a) $17,889,033 for the outstanding balance owed under the Contracts for the construction of the Vessels;

b) Interest at a rate 8.0% per annum on the outstanding balance owed as per the Contracts;

c) Unpaid costs associated with the refurbishment, removal and storage of the winches;

d) Additional costs and expenses incurred by Conrad in completing, maintaining and providing security for the Vessels

### DEMAND FOR JURY TRIAL

### 52.

Conrad requests a trial by jury.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Conrad Shipyard, L.L.C., prays that after due proceedings are had, there be judgment in favor of Plaintiff and Plaintiff shall recover against Defendants, Franco Marine 1, LLC, Franco Marine 2, LLC and Harley Marine Services, Inc., in an amount determined by the trial, along with interest, and such other and further relief, both special and general, at law or in equity, to which Plaintiff may be justly entitled.

This 3rd day of June 2019,

                                          Respectfully submitted,

                                          BALDWIN HASPEL BURKE & MAYER

                                          */s/ Lawrence R. DeMarcay, III*
                                          LAWRENCE R. DeMARCAY, III (#25379) T.A.
                                          1100 Poydras Street, Suite 3600
                                          New Orleans, LA 70163
                                          Telephone: 504-569-2900
                                          ldemarcay@bhbmlaw.com

                                          ***Attorneys for Conrad Shipyard, L.L.C.***