## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

<table>
<tr><td>

CONRAD SHIPYARD, L.L.C.
     Plaintiff,

VERSUS

FRANCO MARINE 1, LLC,
FRANCO MARINE 2, LLC and
HARLEY MARINE SERVICES, INC.
     Defendants.

</td><td>

CIVIL ACTION

NO. 19-10864

JUDGE CARL J. BARBIER

MAG. JUDGE JANIS VAN MEERVELD

</td></tr>
</table>

## HARLEY MARINE SERVICES, INC.'S
## MEMORANDUM OF LAW ON INDEMNIFICATION

Harley Marine Services, Inc. ("HMS") respectfully submits this memorandum of law on its claims for indemnification against Harley Franco ("Franco") and FM1 and FM2 (the "Franco Entities") for damages the jury awarded Conrad Shipyard, L.L.C. ("Conrad") and Franco's claim for officer/director indemnification against HMS.

## PRELIMINARY STATEMENT

Before trial, the parties agreed that the Court would resolve these indemnification claims post trial. On December 16, 2022, the jury awarded Conrad $7,494,930 against HMS, finding that (a) as to their dealings with Conrad, the Franco Entities were HMS's agents acting within the scope of their actual or apparent authority; and (b) HMS, through its employees and representatives, made promises that Conrad justifiably relied upon when making the decision to build the two vessels at issue in this case (the "Vessels"). The jury found that the Franco Entities did not prove that HMS agreed, implicitly or explicitly, to reimburse the Franco Entities for the $2 million down payment they made and the expenses they incurred in connection with constructing the Vessels, and that HMS does not owe the Franco Entities anything related to those payments.

The evidence adduced at trial made clear that HMS's liability to Conrad is entirely vicarious, based on acts of the Franco Parties that were the primary or true cause of Conrad's

1

damages.  Specifically, the evidence established that (i) HMS engaged Franco as its agent for the specific purpose of contracting with Conrad for the construction of the Vessels in his individual capacity and at his own risk; and (ii) it was Franco's responsibility to make the down payments needed to begin construction of the Vessels, procure construction and take-out financing to fund the construction, and make all payments necessary to complete it.

But the evidence established that Franco and the Franco Entities (collectively, the "Franco Parties") did not fulfill their obligations as HMS's agents.  Although Franco paid the $2 million down payment, the Franco Parties did not procure financing or make the payments necessary to complete construction of the Vessels.  Had they done so, Conrad would have been paid in full and suffered no harm.  At that point, according to Franco, HMS would have been obligated to buy or lease the Vessels from him at a profit under the Board Approval Memo (the "BAM").  HMS disputed approving that part of the BAM, but in the end it was irrelevant because the Franco Parties failed to complete construction of the Vessels at their expense, as Franco agreed they would do. Instead, Conrad was left to do so at its own expense.  It then sold the Vessels for less than the Franco Entities agreed to pay for them and sued HMS for the difference.  The jury awarded Conrad damages against HMS, finding it authorized the Franco Parties to act on its behalf with respect to their dealings with Conrad—*i.e.*, to fund construction of the Vessels at their own risk.  The Franco Parties must therefore indemnify HMS for the damages flowing from their failure to do so.

And that is what the law of agency and the jury's verdict require.  It is well settled that, as to third parties, the principal is bound by the agent's apparent authority, which is viewed from the third parties' perspective and can include actions outside the scope of its actual authority.  But as between principal and agent, the principal (HMS) is only bound by the actual authority of the agent (the Franco Parties).  The jury found that from Conrad's perspective, the Franco Entities had

apparent authority to enter the construction contracts on HMS's behalf and thus bind it to those contracts. But as the dealings between HMS and Franco made clear, the Franco Entities only had actual authority to enter the contracts at their own risk. They did not have authority to bind HMS financially to the contracts. That is why the jury found HMS liable to Conrad for the sums due under the construction contracts but not to the Franco Entities for reimbursement of the sums they paid in connection with those contracts. That core distinction between actual and apparent authority also supports a judgment in HMS's favor because it was the Franco Parties' failure to fulfill the obligations that defined the scope of their actual authority that caused Conrad's damages.

HMS is also entitled to a judgment dismissing Franco's claim for indemnification. Under controlling statutory law, that HMS is entitled to a judgment against Franco on its indemnification claim prohibits him from obtaining indemnification as a matter of law. Further, the fact that Franco admitted using significant HMS-owned assets—including $491,300 and two tow winches worth more than $1 million—to finance his purchase of the Vessels without the knowledge or unanimous consent of the HMS board also precludes him from recovering indemnification.

For the reasons outlined above and amplified below, the Court should enter judgment in HMS's favor (i) on its indemnification claims against the Franco Parties for $7,494,930; and (ii) dismissing Franco's claim for indemnification under HMS's by-laws.

## FACTUAL BACKGROUND

### A.    The Vessel Investment Agreement Governed And Limited Harley Franco's Ability To Build And Acquire Vessels In His Individual Capacity.

Harley Franco is the former Chairman, President, CEO, and majority owner of HMS.[1] During his tenure at HMS, Franco routinely built vessels individually through entities he owned

---

[1] (12/12/22 (p.m.) Tr. at 157:22-158:1 (Lipely); *id.* at 246:9-10 (Theriot); 12/14/22 (a.m.) Tr. at 588:4-8 (Bachteler); 12/14/22 (p.m.) Tr. at 708:3-4 (Franco).)

and then leased or sold those vessels to HMS at a profit.[2]  Franco admitted at trial that he often "took on the business risk and used [his] personal credit through various special-purpose vehicle entities to acquire existing vessels and construct new vessels that would then be chartered to HMS at favorable charter higher rent rates."[3]  Matthew Godden ("Godden")—who was HMS's COO and is now its successor's CEO—identified eight prior vessels that Conrad built for Franco that he then sold to HMS for a profit.[4]  Godden also identified three other entities owned by Franco through which he owned vessels that he leased to HMS for a profit.[5]

The evidence showed that Franco, HMS, and Macquarie Marine Services, LLC ("Macquarie"), HMS's minority owner, entered into a "Vessel Investment Agreement" to establish a procedure to limit and control the circumstances under which Franco could build or acquire vessels.[6]  Godden testified that the Vessel Investment Agreement became necessary because even after Macquarie acquired nearly 50% of HMS in the summer of 2008, Franco continued to buy and build vessels without giving prior notice to or seeking approval from the HMS board, leaving it to HMS to find a way to pay for the vessels.[7]

The Vessel Investment Agreement's purposes included: (i) to "institute a process by which proposals for new vessel acquisitions by the Company are presented to the Company's Board of Managers for approval, or if not approved, a process by which Franco may, subject to the limitations set forth herein, move forward with such proposals at his own risk outside HMS; and (ii) to "establish procedures by which HMS shall have the exclusive right to purchase vessels from

---

[2] (12/15/22 (a.m.) Tr. at 784:9-17, 791:19-792:1 (Franco); 12/13/22 (p.m.) Tr. at 530:7-16 (Godden).)
[3] (12/15/22 (a.m.) Tr. at 791:19-792:1 (Franco).)
[4] (12/13/22 (p.m.) Tr. at 530:21-533:6 (Godden).)
[5] (12/13/22 (p.m.) Tr. at 534:8-25 (Godden).)
[6] (Ex. J-010 at 0001 (¶ B); *id.* at 0003 (¶ 2); *see also* 12/13/22 (p.m.) Tr. at 540:1-7 (Godden); 12/14/22 (a.m.) Tr. at 657:4-16 (Bachteler).)
[7] (12/13/22 (p.m.) Tr. at 540:8-541:5 (Godden); *see also* 12/14/22 (a.m.) Tr. at 657:17-658:3 (Bachteler).)

Franco."[8]   To that end, the Agreement required HMS management, which included Franco, to present in writing "all proposals for new Vessel Asset construction or acquisition to the Company's Board of Managers in advance of any oral or written commitment to proceed with the same."[9]   The Vessel Investment Agreement, as well as HMS's governing constitutive documents, required unanimous board approval before HMS could proceed with a vessel proposal itself.[10]   If the board decided that HMS would not construct the proposed vessel, Franco could choose to do so "outside HMS at his own risk."[11]   The Agreement provided that if Franco decided to build a vessel himself, HMS would have "the right, but not the obligation," to purchase or lease the vessel from him.[12]

### B.   Months Before Seeking Board Approval, Franco Committed To Phillips 66 That HMS Would Provide It Two New Vessels And Approached Conrad About Building Those Vessels.

In late January 2017, Harley Franco contacted Gary Lipely ("Lipely"), Conrad's director of marketing and sales, about the potential construction of the Vessels at issue in this case.[13]   The reason for those potential construction projects was, as Franco explained it to Lipely, that Franco had committed to Phillips 66 ("P66"), one of HMS's largest customers, that HMS would replace the older tugboats servicing two P66 contracts with new ones.[14]   As Franco admitted, he made that commitment to P66 and reached out to Conrad about the Vessels without the knowledge or approval of the HMS board,[15] in violation of the Vessel Investment Agreement.   Indeed, Franco

---

[8] (Ex. J-010 at 0003 (¶ 2).)
[9] (Ex. J-010 at 0003 (¶ 3).)
[10] (Ex. J-010 at 0004 (¶ 3) (requiring approval of all members); Ex. J-107 at 0023 (defining "Unanimous Board Decision" to include acquiring any asset or making any capital expenditure in excess of $250,000).)
[11] (Ex. J-010 at 0004 (¶ 4).)
[12] (Ex. J-010 at 0004 (¶¶ 5-6).)
[13] (12/12/22 (p.m.) Tr. at 119:4-16, 165:21-166:12 (Lipely); Ex. J-004.)
[14] (12/12/22 (p.m.) Tr. at 166:13-22 (Lipely); Ex. J-024, 8/9/17 Franco email at 0009.)
[15] (12/15/22 (a.m.) Tr. at 804:17-24, 810:13-811:11 (Franco); 12/13/22 (p.m.) Tr. at 545:16-24 (Godden); 12/14/22 (a.m.) Tr. at 670:6-20 (Bachteler); Ex. J-024 at 0009 (Franco stating, "I vote and support building these vessels as we have committed to Phillips that we would as a condition of our extension.").)

executed the Second Amended and Restated Vessel Investment Agreement in May 2017[16]—after he had committed to P66 that HMS would provide it two new vessels and approached Conrad about those vessels, but before he went to the board for approval regarding those vessels.

From the start, Franco's plan was to personally contract with Conrad, through entities he owned, for construction of the Vessels and then lease or sell them to HMS at a profit.[17]  Franco also planned from the outset to have two HMS-owned tow winches installed on the Vessels and to use the value of those winches as part of his down payment for the Vessels.[18]

### C.    HMS's Board Consented To Franco Executing The Indicative Letter With Conrad, But Did Not Commit To Buying Or Leasing The Vessels.

As demonstrated below, Franco executed the indicative commitment letter through which he committed to paying Conrad to construct the Vessels only after HMS's Board consented to him doing so.  The Franco Parties contend that the Board not only consented to Franco signing the commitment letter, but that it also approved the entire transaction proposed in the Board Approval Memo circulated to the members of the Board on August 1, 2017.  While HMS is entitled to a judgment against the Franco Parties on its indemnification claims regardless of whether the Board approved the Board Approval Memo, the evidence at trial demonstrates that it did not do so.

On August 1, 2017, Godden emailed to the HMS board members the Board Approval Memo, which set forth the proposed transaction for which Franco was seeking board approval.[19] In his cover email to the Memo, Godden explained that "Harley Franco, as an individual, has agreed to build the vessels through his financing relationship with CAT finance and CAT finance has tentatively (awaiting final approval) agreed to supply construction and takeout financing for

---

[16] (Ex. J-010 at 0001.)
[17] (12/13/22 (p.m.) Tr. at 443:13-20, 494:18:495:3 (Godden); 12/15/22 (p.m.) Tr. at 936:6-11 (Godden); Ex. J-004.)
[18] (Ex. J-004, 02/14/17 Lipely email; Ex. J-108 at 0003.)
[19] (Ex. J-023.)

these 2 tugboats."[20]   Similarly, in the "Proposed Structure" section, the Board Approval Memo described the transaction for which Franco was seeking the Board's consent as follows:

> As of today, the proposed financing structure is ***Harley Franco, as an individual, would start the build process in one of his personal asset owning entities, come up with and provide initial downstroke to get the shipyard started, and procure both construction and take-out financing***.  Upon completion of construction, Harley Franco would (a) have the option to convert to term note (exercise take-out financing) and lease back to HMS division of Olympic Tug & Barge - OTB/HMS would guarantee lease payments; or (b) sell assets to Olympic Tug and Barge at FMV (construction cost + applicable financing charges).[21]

Thus, the Board Approval Memo Franco claims governed this transaction did not envision a scenario in which HMS would pay Conrad directly for construction of the Vessels or assume Franco's payment obligations to Conrad if he defaulted on them.  Rather, the proposed structure for which Franco was seeking board approval obligated him—in his individual capacity through entities he owned—to (i) provide the down payments for the Vessels; (ii) procure construction and take-out financing for the Vessels; and (iii) make the payments necessary to complete construction of the Vessels.  At trial, Franco admitted that the financing structure proposed in the Board Approval Memo required him, not HMS, to provide the down payment, procure construction and take-out financing, and pay Conrad for the construction of the Vessels.[22]

As set forth in the second sentence of the "Proposed Structure" section, Franco also proposed that he be granted the option to lease or sell the Vessels to HMS.[23]  Even under that proposal, it was only after "completion of construction" of the Vessels that HMS would be obligated to lease or buy the Vessels.  Franco acknowledged that under the structure proposed in the Board Approval Memo, his option to require HMS to buy or lease the Vessels would only kick

---

[20] (Ex. J-023 at 0001.)
[21] (Ex. J-023 at-0004 (emphasis added).)
[22] (12/15/22 (a.m.) Tr. at 828:7-22 (Franco); *see also* 12/13/22 (p.m.) Tr. at 547:13-22 (Godden).)
[23] (Ex. J-023 at-0004; 12/13/22 (p.m.) Tr. at 463:25-464:25 (Godden).)

in once construction was complete.[24]

For two weeks after Godden first circulated the BAM on August 1, 2017, the members of HMS's board debated the transaction proposed by Franco,[25] which undeniably required unanimous board consent.[26]  After more than a week of debate, Godden emailed Bachteler and the other board members on August 12, 2017, to explain that while the board had not approved Franco's proposed transaction, they understood that the construction of the two vessels should start:

> Regardless of the ultimate structure, I think I've heard everyone is understanding and in agreement that we need to move forward on the build process for the 2 new boats.  How they're financed and under what facility will be a discussion that will be helped by providing the below info.[27]

Thus, Godden asked the board to "confirm if it is acceptable to move forward **on the attached build letter** while we review construction and take-out financing options."[28]  The "attached build letter" was the indicative commitment letter Lipely had emailed Godden and Franco on July 14, 2017.[29]  At trial, Godden explained that HMS changed course—from seeking approval for the BAM to seeking approval for the build or "indicative" letter—because Bachteler had rejected the BAM and would not commit HMS to buying or leasing the Vessels, and management was looking for an alternative that would allow Conrad and Franco to move forward with the build process.[30]

On the morning of August 14, 2017, Bachteler approved Franco signing the commitment letter—stating, "I'm ok **with this indicative letter** yes."[31]  Bachteler testified that he (i) approved Franco signing the indicative letter in his individual capacity, not on behalf of HMS; and (ii) did

---

[24] (12/14/22 (a.m.) Tr. at 684:15-17 (Franco); 12/14/22 (p.m.) Tr. at 734:9-14 (Franco); 12/15/22 (a.m.) Tr. at 770:10-12 (Franco).)

[25] (Ex. J-024.)

[26] (Ex. J-010 at 0004, ¶ 3; Ex. J-107 at 0023.)

[27] (Ex. J-102 at 0001.)

[28] (Ex. J-102 at 0001 (emphasis added).)

[29] (*Compare* Ex. J-102 *with* Ex. J-126.)

[30] (12/13/22 (p.m.) Tr. at 450:19-451:1, 453:3-454:1, 466:19-25, 470:2-11, 559:7-21 (Godden).)

[31] (Ex. J-024, 8/14/17 Bachteler email at 0002 (emphasis added).)

not approve the BAM or commit HMS to buying or leasing the Vessels from Franco.[32]

> **D.    Franco, Through The Franco Entities, Entered Into The Construction Contracts With Conrad But Failed To Procure Financing Or Otherwise Pay For Construction Of The Vessels.**

On September 12, 2017, Franco (for FM1 and FM2) and Hernandez (for Conrad) executed the construction contracts.[33]   HMS is not a party to or mentioned in either contract.   The construction contracts required the Franco Entities, for each Vessel, to pay 5% of the Contract Price (or $491,300) as a down payment upon the signing of the contracts and contained payment schedules for the remaining 95%.[34]   No provision of those contracts obligated HMS to make the required payments to Conrad or assume those obligations if the Franco Entities defaulted on them.

In the indicative letter he signed on August 14, 2017, Franco represented to Conrad that he "expected[ed] to obtain construction financing for the Contract Price from CAT Finance no later than 09/15/2017."[35]   But as he admitted at trial, Franco did not obtain construction financing by September 15, 2017, or at any time thereafter.[36]   Franco also admitted that even without that financing, he had the financial wherewithal to pay for the Vessels,[37] as his counsel stipulated before trial.[38]   Nonetheless, when he failed to obtain construction financing, Franco chose not to make the payments due from his two entities to fully fund construction of the Vessels.[39]   As a result, immediately after entering the construction contracts, the Franco Entities began defaulting on them.   Specifically, neither FM1 nor FM2 made the 5% down payment of $491,300 due upon

---

[32] (12/14/22 (a.m.) Tr. at 591:8-20, 600:16-18 (Bachteler).)
[33] (Ex. J-134; Ex. J-135.)
[34] (Ex. J-134 at 0002, 0021; Ex. J-135 at 0002, 0021.)
[35] (Ex. J-101 at 0001 (¶ 2).)
[36] (12/15/22 (a.m.) Tr. at 827:23-828:5 (Franco).)
[37] (12/15/22 (a.m.) Tr. at 793:10-18 (Franco).)
[38] (12/15/22 (a.m.) Tr. at 790:3-5 (Franco).)
[39] (12/15/22 (a.m.) Tr. at 793:10-18 (Franco) (Franco had the financial resources to pay for the Vessels).)

execution of the contracts in September 2017.[40]  FM2 made one payment of $491,300 two months

later in November 2017—using HMS's funds[41]—but made no additional payments thereafter.[42]

FM1 made no payments until May 2018, eight months after execution of the construction

contracts, when it paid Conrad a total of $2 million; FM1 made no other payments to Conrad.[43]

### E.     The Parties Deferred Resolution Of The Indemnification Claims And The Jury Found For Conrad And Against The Franco Entities.

On June 3, 2019, Conrad filed its Complaint, naming the Franco Entities and HMS, but not

Franco, as Defendants.  In response, HMS asserted claims against Franco and the Franco Entities

for indemnification.  The Franco Entities asserted crossclaims against HMS, alleging that they

were entitled to recover from HMS the $2 million they paid to Conrad under the construction

contracts, as well as other costs incurred in connection with those contracts.  Finally, Franco

asserted a counterclaim for indemnification against HMS under the company's by-laws.

Shortly before trial, HMS, the Franco Parties and the Court agreed that the Court, rather

than the jury, would decide the indemnification claims after the jury's verdict.  As a result, the jury

rendered a verdict as to only Conrad's claims against HMS, FM1 and FM2 and the Franco Entities'

claims against HMS.  Specifically, on December 16, 2022, the jury found that Conrad is entitled

to damages of $7,494,930 based on two theories: (i) the Franco Entities had authority to transact

with Conrad as HMS's agents; and (ii) Conrad detrimentally relied on promises made by HMS

employees and representatives when deciding to build the Vessels.  The jury could not reach a

unanimous verdict on whether HMS and the Franco Entities had "operated as a single business

enterprise" and the Court entered a directed verdict in HMS's favor on that theory.[44]

---

[40] (Ex. J-177 at 0004 (setting out the dates on which the Franco Entities made payments).)
[41] (12/14/22 (p.m.) Tr. at 710:16-23 (Franco).)
[42] (Ex. J-177 at 0004.)
[43] (Ex. J-177 at 0004.)
[44] (12/16/22 Tr. at 1037:6-13.)

The jury also (a) found that the Franco Entities' $2 million down payment and the expenses they incurred in connection with the Vessels were within the scope of their authority as HMS's agents; (b) rejected the Franco Entities' claim that HMS agreed, implicitly or explicitly, to reimburse them for the down payment and other expenses they paid in connection with the Vessels; and (c) found that HMS owes the Franco Parties no damages related to the down payments to Conrad for the construction of the Vessels.  After the jury returned its verdict, the Court directed Franco and HMS to file their post-trial briefs on the outstanding indemnification claims by January 17, 2023, and their indemnification reply briefs by January 27, 2023.  This submission follows.

## LEGAL ARGUMENT

**I.    THE FRANCO PARTIES MUST INDEMNIFY HMS FOR THE DAMAGES THE JURY AWARDED CONRAD.**

### A.    To Prevail On Its Indemnification Claims, HMS Must Demonstrate That Its Liability Is Vicarious And That The Franco Parties Were The Primary Cause Of Conrad's Damages.

HMS has asserted indemnification claims against the Franco Parties, alleging that (i) it has been found vicariously liable to Conrad because the Franco Parties breached their obligations to HMS and exceeded the authority granted to them by HMS; and (ii) the Franco Parties are thus liable to HMS for the damages HMS now owes to Conrad.  On October 18, 2022, the Franco Parties moved for partial summary judgment, seeking dismissal of HMS's indemnification claims by arguing that "a party seeking implied indemnity must *be without fault*, and may not recover if its own acts or omissions in any way contributed to its liability," and thus "[i]f HMS *bears even one iota of responsibility* for any of the acts that exposed it to liability, its indemnity claims fail."[45]

In denying that motion, the Court found that the Franco Parties had "misstate[d] the level of fault required for implied indemnity" because Louisiana law does not require HMS to

---

[45] (Rec. Doc. 81-1 at 19, 21.)

demonstrate that it is entirely without fault to prevail on its indemnification claims.[46]   Rather, the Court held, "if HMS is technically or constructively liable for Conrad's loss, but [Franco's] acts were the true fault or cause of Conrad's damage, HMS can shift the entire loss to [the Franco Parties]," who are "primarily responsible for the breach of contract."[47]   The Fifth Circuit has similarly explained that "'[i]ndemnity . . . finds its basis in the concept of unjust enrichment, *i.e.*, *the party primarily at fault* is unjustly enriched when *one held liable vicariously or by reason of technical fault* discharges the indebtedness.'"   *Martco Ltd. P'ship v. Bruks Inc.*, 430 F. App'x 332, 335 (5th Cir. 2011) (quoting *Mayo v. Benson Chevrolet Co.*, 717 So.2d 1247, 1249 (La. App. 5th Cir. 1998)) (emphasis added).   That is because implied indemnification "is based on the principle that everyone is responsible for his own wrongdoing, and if another person has been compelled to pay a judgment which ought to have been paid by the wrongdoer, then the loss should be shifted to the party whose negligence or tortious act caused the loss."   *Nassif*, 739 So. 2d at 185.

Here, as demonstrated below, both elements of a claim for implied indemnification exist: (1) HMS's liability to Conrad based on agency principles is entirely vicarious and technical; and (2) the Franco Parties' actions—specifically, their failure to fulfill their obligations to make the requisite down payments, procure construction and take-out financing and pay for the construction of the Vessels—were the primary or true cause of the damages suffered by Conrad.   Indeed, had the Franco Parties fulfilled those obligations, which they willingly undertook when they executed the construction contracts, Conrad would have been paid in full for the Vessels and thus would have suffered no harm whatsoever.   As a result, HMS is entitled to judgment in its favor and against the Franco Parties for the full damages for which HMS is now liable to Conrad.

---

[46] (Rec. Doc. 91 at 9.)
[47] (Rec. Doc. 91 at 9-10 (citing *Nassif v. Sunrise Homes, Inc.*, 739 So. 2d 183, 187 (La. 1999).)

**B.    HMS's Liability To Conrad Is Entirely Vicarious And The Franco Parties' Failure To Fulfill Their Obligations As HMS's Agents Was The True Cause Of Conrad's Damages.**

HMS was not a party to the construction contracts and thus—as both a practical and legal matter—could not have directly breached those Contracts.  *See Eddie Tourelle's Northpark Hyundai, LLC v. Hyundai Motor Am. Corp.*, 2019 U.S. Dist. LEXIS 843 (E.D. La. May 20, 2019) ("Under Louisiana law, it is well-settled that an individual cannot be liable for breach of a contract to which he is not a party.") (quotation omitted); *Grigsby & Assocs. V. City of Shreveport*, 294 F. Supp. 3d 529, 544 (W.D. La. 2018) (holding that "the individual defendants are not parties to the contract and cannot be held personally liable for its breach").  As a result, Conrad sought to hold HMS liable for the Franco Entities' contractual breach based on either (i) the single-business enterprise theory or (ii) principles of agency.  The jury did not reach a unanimous verdict on the single-business enterprise theory, but did find that the Franco Entities were acting as HMS's agents when they entered into the construction contracts and thus, under agency principles, HMS is liable to Conrad for the Franco Entities' breach of the payment obligations imposed by those contracts.

The jury's finding that HMS is liable to Conrad based on agency principles for the Franco Entities' breach of the construction contracts is a textbook example of vicarious liability because HMS's liability is based not on anything it did or failed to do but rather on the Franco Entities' breach of contractual obligations they owed to Conrad.  *See, e.g., Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."); *Entente Mineral Co v. Parker*, 956 F.2d 524, 526 (5th Cir. 1992) ("Section 219 of the Restatement (Second) of Agency discusses the circumstances in which a master or principal is liable for the torts of his servant or agent. Subsection (1) of § 219 provides that a principal or master is vicariously liable for the torts of his agent or servant that are committed

13

within the scope of employment.").  The Court's jury instruction on agency makes clear that HMS is being held vicariously liable for the Franco Entities' acts, as it states, *inter alia*, that (i) "[a]ny act or omission of an agent within the scope of its authority is binding on the principal;" (ii) "if FM1 and FM2 were acting within the scope of their actual or apparent authority to bind HMS when they contracted with Conrad to build the vessels, then HMS is bound by those contracts; and (iii) "[a]n agent is not itself liable for any contracts with third parties that he or she makes with authority on behalf of a fully disclosed principal."[48]

Further, the trial evidence makes abundantly clear that Franco and the Franco Entities' acts were the primary and true cause of Conrad's damages.  In analyzing that evidence, the starting point is two interrelated documents that define the precise scope and nature of the Franco Parties' agency authority: (i) the Vessel Investment Agreement; and (ii) the Board Approval Memo.

The Vessel Investment Agreement, as detailed above, established limitations on Franco's ability to build vessels in his individual capacity, providing that (i) if the board did not approve HMS undertaking the project, Franco could choose to proceed with the opportunity; (ii) if Franco chose to fund the project, he was doing so "outside HMS at his own risk;" and (iii) HMS had "the right, but not the obligation," to buy or lease any vessel built by Franco.  In short, the Vessel Investment Agreement established the baseline of Franco's agency authority (as well as that of the entities through which he acted) when he built a vessel in his individual capacity — *i.e.*, he was doing so at his own risk and had no ability to force HMS to buy or lease the vessel from him.  As a result, by entering the Vessel Investment Agreement, Franco agreed that he would not be entitled to reimbursement from HMS for the expenses he incurred when building a vessel personally.

The BAM—which Godden testified he drafted and circulated to the board for the specific

---

[48] (Rec. Doc. 133 at 11-12.)

purpose of complying with the requirements of the Vessel Investment Agreement[49]—proposed to define Franco's agency authority for purposes of the Conrad Vessels.  Specifically, the transaction for which Franco was seeking board approval had two components.  First, as set forth in the first sentence of the Memo's "Proposed Structure" section, the proposal would have obligated Franco, in his individual capacity, to (i) provide the down payments; (ii) procure construction and take-out financing; and (iii) pay Conrad to build the Vessels.[50]  Franco admitted that the structure proposed in the BAM would have required him—not HMS—to provide the down payment, procure financing, and pay for the construction of the Vessels.[51]

Second, the BAM proposed, in the second sentence of the "Proposed Structure" section,[52] that Franco be granted the option to lease or sell the Vessels to HMS.[53]  But as Franco acknowledged at trial,[54] he would only have had the option to sell or lease the Vessels to HMS— and HMS would only have been obligated to buy or lease them from him—after "completion of construction" of the Vessels.[55]  In other words, even under Franco's proposal, he would not be entitled to reimbursement of the costs he incurred to build the Vessels unless and until the Vessels were fully constructed, which only would have occurred if Franco, as he was admittedly obligated to do, made the down payments, procured financing, and paid for the Vessels in full.

As detailed above, the trial evidence demonstrates that the HMS board did not approve the entire transaction proposed in the BAM.  But HMS would be entitled to a judgment against the Franco Parties on its indemnification claims even if the Board had approved the BAM in its

---

[49] (12/15/22 (p.m.) Tr. at 935:9-24 (Godden).)
[50] (Ex. J-023 at-0004.)
[51] (12/15/22 (a.m.) Tr. at 828:7-22 (Franco).)
[52] (Ex. J-023 at 0004.)
[53] (Ex. J-023 at 0004; 12/13/22 (p.m.) Tr. at 463:25-464:25 (Godden).)
[54] (12/14/22 (a.m.) Tr. at 684:15-17 (Franco); 12/14/22 (p.m.) Tr. at 734:9-14 (Franco); 12/15/22 (a.m.) Tr. at 770:10-12 (Franco).)
[55] (Ex. J-023 at 0004.)

entirety.  That is because, as detailed above, the complete transaction proposed in the Board Approval Memo would only have obligated HMS to buy or lease the Vessels from him after "completion of construction" of the Vessels.  Unanimous board consent to the entire BAM would not have obligated HMS to directly make the payments in the construction contracts or assume those payment obligations if the Franco Entities defaulted on them.  Rather, it would have obligated HMS to buy or lease the Vessels *if and only if* the Franco Parties fulfilled the obligations imposed on them and thereby completed construction of the Vessels, which never occurred.

Accordingly, regardless of whether the HMS board consented to the entire BAM, as Franco claims, or just approved Franco entering into the indicative commitment letter with Conrad, the trial evidence makes clear that the Franco Entities were HMS's agents for the limited purpose of entering into contracts with Conrad for the construction of the Vessels at Franco's own risk.  In undertaking that agency relationship, Franco expressly agreed that he was obligated (i) to make the requisite down payments; (ii) to obtain construction and take-out financing; and (iii) to pay Conrad all sums necessary and contractually required to complete construction of the Vessels.

It is undisputed that the Franco Parties did not fulfill those obligations.  As detailed above, they did not timely make the down payments of $491,300 due upon execution of the construction contracts in September 2017, never obtained financing for the Vessels, failed to make the payments due under the construction contracts, and thus did not complete construction of the Vessels.

Critically, it was the Franco Parties' failure to fulfill any of the obligations they willingly undertook as HMS's agents for purposes of contracting with Conrad that was the primary and true cause of Conrad's damages.  Indeed, all of Conrad's damages flow from the Franco Parties' failure to satisfy the obligations they undertook as HMS's agents.  Conrad's damages consist of (i) the difference between the amounts FM1 and FM2 failed to pay under the construction contracts and

the amounts for which Conrad sold the Vessels to a third party (plus additional costs to complete the Vessels for the third party); and (ii) interest due under the contracts for late payments.[56] Conrad suffered those damages not because of anything HMS did or did not do, but rather because Franco and his two entities failed to make the required down payments, obtain financing, and pay the sums due under the construction contracts to complete construction of the Vessels.

In sum, HMS's liability for the Franco Parties' breach of contract is, as a matter of law, entirely vicarious. Further, the trial evidence demonstrates that the Franco Parties' failure to fulfill the obligations they undertook as HMS's agents was the true and primary cause of Conrad's damages. As a result, HMS is entitled to a judgment in its favor and against the Franco Parties for the full amount of damages HMS now owes Conrad, $7,494,930.00.

### C.   A Judgment In HMS's Favor On Its Implied Indemnification Claims Is Consistent With And Supported By The Jury's Verdict.

Although the jury was not asked to reach a verdict on HMS's indemnification claims, the verdict it reached confirms HMS's entitlement to a judgment on those claims. In finding HMS liable for the Franco Entities' breach of the construction contracts and awarding Conrad damages totaling $7,494,930, the jury found that (i) FM1 and FM2 were HMS's agents and "with respect to their dealings with Conrad, [they] were acting within the scope of their actual or apparent authority;" and (ii) HMS, through its employees and representatives, made promises to Conrad that it detrimentally relied on when making the decision to build the Vessels.[57] The jury, however, was unable to reach a unanimous verdict on whether HMS, FM1 and FM2 "operated as a single business enterprise"[58] and the Court granted HMS a directed verdict on that theory of liability.

As a threshold matter, that the jury did not find HMS liable to Conrad based on the single-

---

[56] (Ex. J-177.)
[57] (Rec. Doc. 135 at 1-2 (Question Nos. 3-5, 7-8).)
[58] (Rec. Doc. 135 at 2 (Question No. 6).)

business enterprise theory is significant because that theory—unlike vicarious liability based on agency principles—only applies when the defendant that is not a party to the contract engages in active wrongdoing.  As the Court explained, "to impose liability on a corporate defendant for breach of a contract to which it is not a party under the single business enterprise theory," the plaintiff must prove, *inter alia*, that the corporate defendant "abused the corporate form by engaging in fraud, misrepresentation, or some form of manipulation of the corporation."[59]  Thus, that the jury found HMS liable for Conrad's damages because the Franco Entities were its agents but did not find that HMS and the Franco Entities operated as a single business enterprise strongly suggests that the jury held HMS vicariously liable for the Franco Entities' actionable conduct.

With respect to the Franco Entities' crossclaims against HMS for reimbursement and detrimental reliance, the jury (i) found that the $2 million down payment and other expenses the Franco Entities paid to Conrad "were within the scope of their authority as agents of HMS"; but (ii) did not find that HMS "agreed, implicitly or explicitly, to reimburse FM1 and FM2 for the $2 million down payment and expenses they incurred in connection with the Conrad vessels"; and (iii) was unable to reach a unanimous decision on whether HMS made any promises to the Franco Entities on which they reasonably relied when making the $2 million down payment.[60]  As a result, the jury found that even though the Franco Entities had incurred the down payment and other expenses within the scope of their agency authority, they were entitled to no damages from HMS.[61]

The jury's verdict is consistent with and supportive of a judgment in HMS's favor on its indemnification claims.   As demonstrated above, regardless of whether the HMS board unanimously consented to the entire Board Approval Memo or just to Franco entering into the

---

[59] (Rec. Doc. 133 at 14.)
[60] (Rec. Doc. 135 at 3 (Question Nos. 10-13).)
[61] (Rec. Doc. 135 at 4 (Question No. 14).)

indicative commitment letter, the trial evidence established that Franco was HMS's agent for the specific and limited purpose of contracting with Conrad <u>in his individual capacity</u> and <u>at his own risk</u> to build the Vessels and, in that agency capacity, was obligated to complete construction of them.  His failure to complete construction of the Vessels is the true cause of Conrad's damages, which therefore entitles HMS to judgment in its favor on its implied indemnification claims.

> **D.    A Judgment In HMS's Favor On Its Implied Indemnification Claims Is Consistent With And Supported By Settled Principles Of Agency Law.**

It is consistent with settled agency law—specifically, the distinction between actual and apparent authority—that the Franco Parties are liable to HMS for the damages it owes Conrad.  As explained in *Boulos v. Morrison*, 503 So. 2d 1 (La. 1987), the limits of an agent's authority as to its principal are different from the limits of its authority as to third parties:

> An agent's power or authority is composed of his actual authority, express or implied, together with the apparent authority which the principal has vested in him by his conduct. . . . As between principal and agent the limit of the agent's authority to bind the principal is governed by the agent's actual authority.  As between the principal and third persons, the limit of an agent's authority to bind the principal is governed by his apparent authority.

*Id.* at 3 (citations omitted).

It is well settled under Louisiana law that "[a]n actual agency is a contract between the principal and agent created either expressly or by implication."  *McLin v. HI HO, Inc.*, 118 So. 3d 462, 467 (La. App. 1st Cir. 2013).  Express actual authority "is created expressly by the verbal or written agreements between the agent and the principal."  *Fleet Finance, Inc. v. Loan Arranger, Inc.*, 604 So. 2d 656, 659 (La. App. 1st Cir. 1992).  Implied actual authority "is inferred from the circumstances and nature of the agency itself" and thus "'[a]n agent is vested with the implied authority to do all of those things necessary or incidental to the agency assignment.'"  *Pailet v. Guillory* 315 So. 2d 893, 896 (La. App. 3d Cir. 1975) (quoting *Broadway v. All- Star Insurance Corporation*, 285 So. 2d 536, 538 (La. 1973)).  Accordingly, implied agency exists "when, from

the nature of the principal's business and the position of the agent within that business, the agent is deemed to have permission from the principal to undertake certain acts which are reasonably related to the agent's position and which are reasonable and necessary concomitants of the agent's express authorization." *AAA Tire & Export, Inc. v. Big Chief Truck Lines, Inc.*, 385 So. 2d 426, 429 (La. App. 1st Cir. 1980). "Generally, one should look from the viewpoint of the principal and the agent to determine whether the agent has implied authority." *Id.*

Conversely, "'[a]pparent authority is a doctrine by which an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction, although the principal has not actually delegated this authority to the agent.'" *McLin*, 118 So. 3d at 468 (quoting *Tedesco v. Gentry Dev., Inc.*, 540 So.2d 960, 963 (La. 1989)). Thus, "[a]pparent authority is a judicially created concept of estoppel which operates in favor of a third party seeking to bind a principal for the unauthorized act of an apparent agent." *Boulos*, 503 So. 2d at 3. Stated differently, "'[a]pparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him" and "is distinguished from actual authority because it is the manifestation of the principal to the third person rather than to the agent that is controlling.'" *Aker Sols., Inc. v. Shamrock Energy Sols, LLC*, No. 16-2560, 2019 U.S. Dist. LEXIS 17400, at *43 (E.D. La. Oct. 8, 2019) (quoting *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985)). While the scope of an agent's actual authority is determined from the perspective of the principal and agent, "[o]ne must look from the viewpoint of the third party to determine whether an apparent agency has been created." *McCray v. S. Aggregates, LLC*, 282 So. 3d 262, 268 (La. App. 1st Cir. 2019).

Viewed through the lens of these principles of agency law, it makes sense that the jury would find HMS vicariously liable to Conrad for the damages caused by the Franco Entities' contractual breach but not liable to reimburse the Franco Entities for the down payment and other expenses they paid in connection with the Vessels—and, by extension, that HMS is entitled to a judgment on its implied indemnification claim against the Franco Parties for the damages HMS must now pay Conrad. The jury clearly found that, from Conrad's perspective, the Franco Parties had apparent authority to enter into the construction contracts on HMS's behalf and thereby to obligate HMS to bear financial responsibility for those contracts. But the trial evidence demonstrated that Franco's actual authority was not the same as his apparent authority because he was expressly ***not*** permitted to obligate HMS to satisfy the payment obligations imposed by the construction contracts. Franco's actual authority was more limited because—regardless of whether the board approved the entire BAM—he (i) was authorized by HMS to contract with Conrad individually and at his own risk and (ii) agreed that, as HMS's agent, he would make the required down payments, obtain financing and pay to complete construction of the Vessels.

The manner in which the jury answered the Verdict Form (Rec. Doc. 135) makes clear they understood the distinction between the Franco Parties' actual and apparent authority. In finding HMS liable to Conrad under agency principles, the jury answered "Yes" to Question No. 4, which asked: "Do you find by a preponderance of the evidence that, with respect to their dealings with Conrad, FM1 and FM2 were acting within the scope of their actual or apparent authority?" Question No. 4 did not ask the jury to specify whether the Franco Entities were acting with actual or apparent authority because it did not matter for purposes of HMS's liability to Conrad.

But as to the Franco Entities' reimbursement claims, the distinction between their actual and apparent authority is critical. In that regard, Question No. 10 on the Verdict Form asked:

21

> Do you find by a preponderance of the evidence that HMS agreed, implicitly or explicitly, to reimburse FM1 and FM2 for the $2 million down payment and the expenses they incurred in connection with the Conrad vessels?

The jury answered "No" to Question No. 10, thus finding that ***the Franco Entities did not have actual authority*** to obligate HMS to bear the cost of that down payment and those expenses.

Question No. 11, in turn, asked:

> Do you find by a preponderance of the evidence that FM1 and FM2's $2 million down payment and the expenses they incurred in connection with the Conrad vessels were within the scope of their authority as agents of HMS?

In answering "Yes" to Question No. 11, the jury found—consistent with the evidence at trial—that ***Conrad believed*** the Franco Parties had authority to obligate HMS to bear the cost of that down payment and those expenses—and thus, that ***the Franco Parties had apparent authority*** to do so.  Then, Question No. 14 asked:

> If you answered "Yes" to question 10, 11 or 13, what amount, if any, does HMS owe to FM1 and/or FM2 related to down payments to Conrad for construction of the vessels.

In keeping with its finding that the Franco Entities had apparent but not actual authority to obligate HMS to bear the cost of the down payment and related expenses they paid Conrad—meaning that as between HMS and Conrad, HMS was obligated to make those payments but as between HMS and the Franco Entities, it was not—the jury answered Question No. 14 with an unequivocal, "None."  The jury's answers on the Verdict Form were thus consistent and reflected a sound application of the principles of agency law the Court explained to the evidence adduced at trial.

The trial evidence makes clear that Franco's actual agency, as defined by his agreements with HMS, authorized him to contract with Conrad individually and at his own risk and obligated him to obtain financing, pay for the Vessels, and complete their construction.  Conrad suffered the damages HMS must now pay because Franco failed to do so.  HMS is thus entitled to a judgment against the Franco Parties on its indemnification claims for the amount of Conrad's damages.

**II.    HMS IS ENTITLED TO A JUDGMENT DISMISSING FRANCO CLAIM'S FOR INDEMNIFICATION.**

Franco asserted a claim for indemnification against HMS under its by-laws.  Section 11.2(a) of HMS's by-laws provides that HMS's directors and officers are entitled to indemnification "to the full extent permitted by the Washington Business Corporation Act."[62]

Section 23B.08.510 of the Washington Business Corporation Act ("WBCA") provides that "a corporation may indemnify an individual made a party to a proceeding because the individual is or was a director against liability incurred in the proceeding if (a) [t]he individual acted in good faith; and (b) [t]he individual reasonably believed: (i) [i]n the case of conduct in the individual's official capacity with the corporation, that the individual's conduct was in its best interests; and (ii) [i]n all other cases, that the individual's conduct was at least not opposed to its best interests." RCW § 23B.08.510(1).  That provision also provides that "[a] corporation may not indemnify a director under this section . . . [i]n connection with a proceeding by or in the right of the corporation in which the director was adjudged liable to the corporation."  RCW § 23B.08.510(4)(a).  Further, section 23B.08.520 of the WBCA provides that "a corporation shall indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which the director was a party because of being a director of the corporation against reasonable expenses incurred by the director in connection with the proceeding."  RCW § 23B.08.520.  As demonstrated above, HMS is entitled to a judgment against Franco on its indemnification claim.  As a result, Franco is precluded from obtaining indemnification pursuant to sections 23B.08.510(4)(a) and 23B.08.520 of the WBCA because he shall have been adjudged liable to HMS and was not wholly—or even partially—successful in his defense of HMS's claims against him.

Further, even if Franco was not liable to HMS on its indemnification claim, he would not

---

[62] (Ex. J-104 at 0018.)

be entitled to indemnification because HMS's by-laws and the WBCA preclude a corporate officer or director from obtaining indemnification for (i) "acts or omissions that involve intentional misconduct;" (ii) "a knowing violation of law," or (iii) "any transaction from which the director will personally receive a benefit in money, property, or services to which the director is not legally entitled."  RCW § 23B.08.320; Ex. J-104 at 0018 (§ 11.2(a)).  All three exceptions apply here.

Specifically, the limited-liability-company agreements governing HMS's holding companies provide that certain decisions, defined as "Unanimous Board Decisions," require the unanimous consent of the HMS board before the company can proceed with the proposed action.[63]  Unanimous Board Decisions included selling, leasing, exchanging or otherwise disposing of any HMS asset or making any capital expenditure with a value in excess of $250,000.  As demonstrated above, Franco admits that he used $491,300 owned by HMS (but held by Vessel Holdings) for the payment FM2 made to Conrad.[64]  Further, Franco used two HMS tow winches worth at least $650,000 each[65] as credits toward the down payments for the Vessels and caused them to be shipped to Conrad for installation on the Vessels.  Because both the Vessel Holdings funds and the winches were worth well in excess of $250,000, Franco was required, as he admitted at trial, to obtain unanimous board consent to use those assets to fund his construction of the Vessels.[66]

The trial evidence demonstrates, however, that Franco never even sought, much less obtained, unanimous board consent to use the Vessel Holding funds to make a payment to Conrad or to use the HMS-owned tow winches for part of his down payment and as owner-furnished equipment for installation on the Vessels.  Franco admitted at trial that he did not obtain the

---

[63] (Ex. J-107 (HMS LLC Agreement) at 0032-33 (§ 4.1(a)).)
[64] (12/14/22 (p.m.) Tr. at 710:16-23 (Franco) (admitting the $491,300 belonged to HMS).)
[65] (Ex. J-004; Ex. J-108 at 0003; Exs. J-134 & J-135 at 0020.)
[66] (12/15/22 (a.m.) at 839:4-8 (Franco).)

requisite board approval to use the tow winches or the $491,300 held by Vessels Holdings.[67] Further, Bachteler testified that he was unaware at the time that Franco had used either the $491,300 or the winches to help fund his acquisition of the Vessels or that Franco intended to install the HMS-owned winches on the Vessels.[68]  Notably, the Board Approval Memo did not mention that Franco intended to use the tow winches or the Vessel Holdings funds to help finance the Vessels.  Moreover, Franco's use of those company assets was incompatible with his undertaking to finance the construction of the Vessels at his own risk.

In failing to even disclose to the HMS board that he intended to use HMS-owned winches valued at approximately $1.1 million and $491,300 belonging to HMS to help finance his construction of the Vessels, particularly after the board made clear that HMS would not and could not pay for the Vessels itself, Franco engaged in intentional misconduct, knowing violations of the law, and transactions from which he received a personal benefit to which he was not entitled.  *See* RCW § 23B.08.420 (an officer must act in good faith and in the corporation's best interests); *Lodis v. Corbis Holdings, Inc.*, 292 P.3d 779, 793 (Wash. Ct. App. 2013) ("Corporate officers owe fiduciary duties of good faith, care, and loyalty [and] are forbidden from acquiring profit for themselves—directly or indirectly—at the expense of the company.").  As a result, all three indemnification exceptions apply here.  Accordingly, even if HMS were not entitled to a judgment against Franco, he would still be precluded from obtaining indemnification under HMS's by-laws.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should enter judgment in HMS's favor (i) on its indemnification claims against the Franco Parties in an amount equal to the damages that HMS now owes Conrad, $7,494,930; and (ii) dismissing Franco's indemnification claim.

---

[67] (12/15/22 (a.m.) Tr. 838:2-839:2 (Franco).)
[68] (12/14/22 (a.m.) Tr. at 603:3-5, 619:17-25 (Bachteler).)

Respectfully submitted,

Date: January 17, 2023

**PHELPS DUNBAR LLP**

*/s/ Jeremy T. Grabill*
Thomas Kent Morrison (Bar No. 25802)
Jeremy T. Grabill (Bar No. 34924)
James H. Gilbert (Bar No. 36468)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: 504-566-1311
Telecopier: 504-568-9130
Email: kent.morrison@phelps.com
jeremy.grabill@phelps.com
james.gilbert@phelps.com

**MARINO, TORTORELLA & BOYLE, P.C.**
Kevin H. Marino (NJ Bar No. 023751984)
(admitted *pro hac vice*)
John D. Tortorella (NJ Bar No. 017871999)
(admitted *pro hac vice*)
John A. Boyle (NJ Bar No. 038552000)
(admitted *pro hac vice*)
437 Southern Boulevard
Chatham, New Jersey 07928
Telephone No. 973-824-9300
Email: kmarino@khmarino.com
jtortorella@khmarino.com
jboyle@khmarino.com
*Attorneys for Harley Marine Services, Inc.*

## CERTIFICATE OF SERVICE

By filing electronically, I certify that service was accomplished through the Notice of Electronic Filing for parties and counsel who are Filing Users and that service was accomplished on any party or counsel who is not a Filing User in accordance with the Federal Rules and the Local Rules of this Court, this 17th day of January, 2023.

*/s/ Jeremy T. Grabill*
**JEREMY T. GRABILL**