UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CONRAD SHIPYARD, L.L.C.                    CIVIL ACTION

VERSUS                                     NO: 19-10864

FRANCO MARINE 1, LLC, ET AL.               SECTION: "J" (1)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case involves a breach of contract claim brought by Conrad Shipyard, LLC, located in Morgan City, Louisiana, against Harley Marine Services (HMS), a marine transportation company located in the State of Washington. Conrad alleged that it built two offshore vessels for HMS, which then refused to pay, resulting in Conrad having to sell the vessels to another party at a financial loss.

Harley Franco is the founder of HMS and, until March 2019, was its Chairman, President, and CEO. In 2017, Harley Franco wished to build two new vessels to service a marine transportation contract with an existing customer, Phillips 66. By that time, the HMS board did not want the additional cost of two new vessels on its balance sheet because it was in the process of negotiating securitization. After discussions, Harley Franco formed two LLCs, Franco Marine 1 ("FM1") and Franco Marine 2 ("FM2"), in July 2017 for the sole purpose of being the contracting parties for the construction of the two vessels by Conrad. Harley Franco, on behalf of FM1,

1

FM2, and HMS, executed the Vessel Construction Contracts on September 12, 2017, for a total amount of $19,652,000.00.

When the HMS/Franco Parties (Harley Franco, FM1, and FM2) ceased making required payments, Conrad was forced to sell the vessels to another party at a reduced price. Conrad then commenced the present action against the Franco LLCs and HMS for breach of contract, under the single business enterprise theory. Conrad also brought a detrimental reliance claim against HMS. HMS counterclaimed for conversion[1] against Conrad, brought a cross-claim for indemnity against FM1 and FM2, and brought a third-party indemnity claim against Harley Franco. FM1 and FM2 filed cross-claims against HMS seeking reimbursement of the $2 million that FM1 paid to Conrad for the Vessels, and Franco filed a counterclaim against HMS seeking indemnification.

A jury trial took place from December 12, 2022 to December 16, 2022.  At the close of the trial, the jury rendered a verdict, answering eleven of fourteen questions on the verdict form. The jury was unable to agree on answers to questions 6 (regarding the single business enterprise theory), 12, and 13 (regarding the Franco LLCs' detrimental reliance claims against HMS). However, the Court found that the jury's answers sufficiently resolved the claims in the trial, excluding the indemnification issues that the parties had previously reserved for the Court's determination. The jury found in favor of Conrad and against HMS, awarding the full $7,494,930.00 sought for breach of contract based on two theories:  first, that the

---

[1] HMS dismissed their conversion claim at trial. HMS had alleged that Conrad converted two tow winches that belonged to HMS because Conrad sold the tow winches after it did not receive payment for the vessels.

2

Franco Parties had actual or apparent authority to transact with Conrad as HMS's agents and, second, that Conrad detrimentally relied on promises made by HMS employees when making its decision to build the two vessels.[2]

As to the Franco Parties' claims, the jury found that the Franco Parties' $2 million down payment and expenses related to the Conrad vessels were incurred within the scope of their authority as HMS's agents, but that HMS did not agree, implicitly or explicitly, to reimburse them for the $2 million.[3] Finally, the jury found that HMS owes no damages to the Franco LLCs related to down payments to Conrad for construction of the vessels.

Shortly before trial began, the Franco Parties and HMS agreed that the Court, rather than the jury, should decide all indemnification issues after the jury's verdict. At the close of trial, the Court ordered the parties to submit briefing on the remaining indemnity issues between HMS and the Franco Parties.

On January 17, 2023, the Franco Parties moved for indemnification, arguing that HMS's implied indemnification claims should be dismissed, and that the Court should rule in Franco's favor on his own indemnification claim. **(Rec. Doc. 146).** HMS also moved for indemnification, arguing that the Court should enter judgment in HMS's favor on its indemnification claims against the Franco Parties for $7,464,930 and dismiss Franco's claim for indemnification under HMS's by-laws.

---

[2] At trial, HMS also moved for a directed verdict on the single business enterprise issue. The jury was unable to resolve whether HMS and the Franco LLCs operated as a single business enterprise. After the jury rendered the verdict for Conrad, HMS re-urged the motion, and the Court granted it, dismissing the single business enterprise claim.

[3] The jury was also unable to determine the outcome of the Franco Parties' detrimental reliance claim. The Court determined that this claim did not affect the completeness of the jury verdict, so the Court accepted the jury verdict.

3

**(Rec. Doc. 148).** In essence, HMS acknowledges its liability to Conrad on the breach of contract claim based on the jury's findings that FM1 and FM2, in signing the contracts with Conrad, were acting pursuant to actual or apparent authority as fully disclosed agents of HMS. However, HMS contends that it is only constructively or vicariously liable to Conrad because the Franco parties breached their obligations to HMS and exceeded the authority given to them by HMS. HMS seeks indemnification from the Franco entities for the full amount of the judgment in favor of Conrad. At the same time, the Franco entities seek reimbursement or indemnification from HMS for the expenditures made as agents for HMS, and for attorney's fees in defending the claims by HMS.

**DISCUSSION:**

    **I.    REIMBURSEMENT OF THE $2 MILLION DOWN PAYMENT**

The Franco Parties assert that HMS must reimburse them for the $2 million down payment for the vessels because the jury found that FM1 and FM2 were acting within the scope of their authority as agents when they made the down payment. (Rec. Doc. 145-1, at 2-3). In response, HMS argues that the Franco parties failed to timely object to the verdict form,[4] which indicates that HMS is not required reimburse the Franco LLCs and also that the Franco Parties were not entitled to damages based on the verdict form and jury instructions on agency. (Rec. Doc. 147)

---

[4] HMS contends that the Franco Parties failed to object to alleged inconsistencies between a general verdict and answers to verdict questions, thus waiving the arguments in their motion. (Rec. Doc. 147, at 5). The Court disagrees with HMS's framing that the Franco Parties' motion for an interim judgment (Rec. Doc. 145) is an objection to inconsistencies in the verdict form. In fact, the Franco Parties' motion contends the opposite: that the jury's answers are both internally consistent and consistent with agency law. Thus, the Court finds that the Franco Parties did not waive their argument by not objecting at the time the verdict was read.

An agency relationship is formed when a person, the principal, confers authority on another person, the agent (or mandatary in Louisiana law), to transact affairs for the principal. La. Civ. Code art. 2989; Restatement (Third) Of Agency §§ 1.01–03 (2006). An agent who contracts in the name of a disclosed principal within the limits of his authority does not bind himself personally for the performance of the contract. La. Civ. Code art. 3016; Restatement (Third) Of Agency § 6.01 (2006). An agent may disclose the principal's identity in actual written or verbal communication to the party with whom the agent is dealing, or if the circumstances surrounding the transaction and knowledge of the contracting party put them on notice of the agency relationship. *J.T. Doiron, Inc. v. Lundin*, 385 So.2d 450, 452–453 (La. App. 1st Cir. 1980). A principal is bound to reimburse an agent for the expenses the agent incurs in performance of their duties as an agent, plus interest from the date of the expenditure. La. Civ. Code. art. 3012-14; Restatement (Third) Of Agency § 8.14 (2006) ("A principal has a duty to indemnify an agent in accordance with the terms of any contract between them and unless otherwise agreed when the agent makes a payment. . . or when the agent suffers a loss that fairly should be borne by the principal in light of their relationship.").

As the Court provided in its legal instructions to the jury, if FM1 and FM2 were acting within the scope of their actual or apparent authority to bind HMS when they contracted with Conrad to build the vessels, then HMS is bound by those contracts. (Rec. Doc. 133, at 11). Further, the LLCs are not liable for any contracts with Conrad that the LLCs made within the limits of their authority on behalf of a

fully disclosed principal, such as HMS.[5] *Id.* at 12. Finally, if FM1 and FM2 were acting as HMS's agents in executing the contract with Conrad and those contracts and related payments were within the scope of their authority as agents, then HMS has a duty to reimburse them. *Id.* at 13.

The jury found that FM1 and FM2 were HMS's agents and, with respect to their dealings with Conrad, were acting within the scope of their actual or apparent authority. The jury also found that Conrad was aware of the principal/agent relationship between HMS and FM1 and FM2. Finally, the jury found that FM1 and FM2 paid the $2 million down payment to Conrad within the scope of their authority as agents of HMS. (Rec. Doc. 135).

Because the jury answered "yes" to question 11, that that FM1 and FM2's $2 million down payment and the expenses were within the scope of their authority as agents of HMS, the Franco Parties argue that, as a matter of law, they are entitled to recover those amounts. (Rec. Doc. 145-1, at 3). In response, HMS argues that the jury's answer to Question 11 simply means the Franco LLCs were authorized to make the down payment, but that the "NONE" answer to Question 14 indicates a finding that LLCs were entering the contract without any expectation that HMS would reimburse them for that payment, based on the Vessel Investment Agreement. (Rec. Doc. 147, at 3-4).

---

[5] The parties do not dispute whether or not the Franco LLCs disclosed the principal-agent relationship with HMS, and the jury answered "YES" to the question of whether Conrad was aware of the agency relationship between HMS and the Franco LLCs. (Rec. Doc. 135, at 2).

HMS contends that the Vessel Investment Agreement ("VIA") between Harley Franco and HMS not only shifted to Franco the financial risks when building a vessel in his individual capacity, but also formed the basis of the agency relationship between the Franco LLCs and HMS. Harley Franco and HMS entered into the VIA in January 2014 and subsequently amended and restated the agreement in June 2015 and again in May 2017. (Rec. Doc. 138-9, at 2). The purpose of the VIA, as outlined in the contract, is to:

> (i) establish a preference among all of the parties for all capital investments to be completed through HMS;
> (ii) limit management distractions;
> (iii) institute a process by which proposals for new vessel acquisitions by the Company are presented to the Company's Board of Managers for approval, or if not approved, a process by which Franco may, subject to the limitations set forth herein, move forward with such proposals at his own risk outside HMS; and
> (iv) establish procedures by which HMS shall have the exclusive right to purchase vessels from Franco.

*Id.* at 3. The "Proposal Process" in the VIA requires, first, HMS management to present proposals for new vessel construction or acquisition to HMS's board of managers. *Id.* Second, the HMS board submits the proposal to each member of the company, and upon unanimous approval, the Board can vote on the proposal. *Id.* at 4. The VIA also provides that if the members of HMS do not approve the proposal, Harley Franco may fund the project at his own risk as long as the total amount of vessels he owns outside HMS does not exceed $15 million. *Id.* It also explains that HMS has the right, but not the obligation, to purchase vessels from Franco at any time for an amount equal to his costs plus 18% or enter an operating lease for the vessel along with Franco. *Id.*

However, HMS's singular focus on the Vessel Investment Agreement is misguided. As outlined above and in the Court's jury instructions, an agency relationship allows a principal to authorize an agent to perform services for the principal, and the agent shall be reimbursed for their expenses in performing those services. The VIA, however, is a contract inapposite for creating an agency relationship; the VIA was essentially an option contract allowing HMS the right, but not the obligation, to purchase or lease a vessel from Harley Franco after he undertook a vessel construction opportunity. (Rec. Doc. 147, at 9). It does not provide an authorization for Franco to act on behalf of HMS as its agent. HMS argues that, simply because none of the parties objected to its closing argument that the VIA controlled the entire circumstances of Franco's dealings with Conrad, the VIA would preempt an agency relationship (along with its incumbent reimbursement requirements). *Id.* at 11. HMS further contends that "the jury's finding that the Franco Entities acted within the scope of their agency when making the down payment is entirely consistent with a finding that they did so at their own risk." *Id.* at 12.

The Court is not persuaded that the VIA created the agency relationship between HMS and Franco or FM1 and FM2. HMS's argument, that the VIA both created an agency with Harley Franco and only allowed him to contract at his own risk, is contradictory. Instead, as the evidence at trial showed, the agency relationship found by the jury was created over time through the parties' course of dealings with Conrad. Evidence presented during the trial established that HMS was

8

actively and directly involved in all of its and its agents' dealings with Conrad. First, HMS contracted directly with a marine architect to design the vessels and negotiated with financers by communicating that the vessels were HMS's. (Rec. Docs. 138-7, 138-14). Second, in connection with the sale, HMS paid directly to Conrad $491,300 in cash and $1.1 million worth of tow winches, in addition to credits it had accrued with Conrad. (Rec. Docs. 138-28; 140-32; 153-5, at 6-8). Third, HMS employees also negotiated the contracts and communicated directly with Conrad, and HMS had its own company representative physically present at the Conrad Shipyard to oversee the construction of the vessels. (Rec. Docs. 138-5, 138-6, 138-20, 138-30). Moreover, evidence at trial showed that the use of the two Franco LLCs as signatories to the construction contracts was consistent with the manner in which HMS and Conrad had done business for a number of other vessels over a number of years. *See* (Rec. Docs. 138-1, 138-9, 138-46).

HMS intended the new Conrad vessels to be supplied to its customer, Phillips 66, which had requested new tugs as a condition to extending its contract. However, HMS lost another large customer, Tesoro/Marathon, who returned approximately 15 vessels to HMS. Once HMS was able to provide two of the Tesoro tugs to Phillips 66, it apparently then decided that it no longer wanted the new Conrad vessels. (Rec. Doc. 139-32)

In addition to the apparent authority Conrad understood the Franco LLCs to have, the jury also found against HMS on Conrad's detrimental reliance claims. (Rec. Doc. 135, at 2). Specifically, the jury found that HMS made promises to Conrad that

9

Conrad justifiably relied upon when deciding to build the vessels, resulting in damages to Conrad. *Id.* This jury finding, that HMS made affirmative statements to Conrad regarding the status of the vessel construction, undermines HMS's argument that the VIA governed the extent of the Franco LLCs authority. Instead, the LLCs' authority was governed by principles of agency law. Thus, as a matter of law, HMS is responsible for reimbursing its agents' expenses including the $2 million down payment plus interest from the time of payment.

Finally, the parties disagree on the jury's reasoning for answering "NONE" for Question 14. On first impression, saying that HMS owes no damages related to down payments may contradict the finding that HMS owes $2 million in reimbursement. However, Question 14 refers to the damages for both of the Franco Parties' theories: (1) detrimental reliance and (2) reimbursement of agent expenses. (Rec. Doc. 135, at 3-4). A logical reading of the verdict form indicates that the "damages" referred to in Question 14 are those related to the $2 million down payment, outside of *or* in addition to the reimbursement of expenses. The Court is not persuaded by HMS's dissection of the jury's understanding of agency law buttressed by the VIA nor by their argument that Franco's agency is comparable to a lawyer representing a client on a contingent-fee basis. (Rec. Doc. 147, at 12-13). Therefore, the most reasonable reconciliation of the jury's responses is that HMS owes the Franco LLCs reimbursement for their down payment as agents, but no additional damages resulting from the detrimental reliance theory.

## II.   HMS'S IMPLIED INDEMNIFICATION CLAIMS

HMS's implied indemnity claims allege that the Franco Parties are liable to HMS for the damages it owes Conrad, reasoning that HMS has been found vicariously liable to Conrad because the Franco Parties breached their obligations to HMS and exceeded the authority HMS granted them. (Rec. Doc. 148, at 11). The Franco Parties argue that HMS's claim for indemnity against FM1 and FM2 fails because (1) even if HMS were only vicariously liable for the breach of contract, the jury found that HMS is actually at fault for harming Conrad under a theory of detrimental reliance, and (2) because the jury found the Franco Parties to be agents of HMS, HMS alone was bound to the contracts with Conrad. (Rec. Doc. 146-1, at 2). In response, HMS argues that the Franco Parties had apparent authority to enter the contracts, but only had actual authority under the VIA to enter the contracts at their own risk, plus make down payments and secure financing. (Rec. Doc. 152, at 3). That distinction in authority, HMS argues, confirms its entitlement to indemnification because the jury must have understood that Conrad's detrimental reliance was based only on the Franco Parties' apparent authority to enter the contracts on behalf of the HMS, but not actual authority, which would necessitate HMS's liability. *Id.* at 5-7.

HMS claims that, to the extent HMS is found liable to Conrad, Harley Franco should indemnify HMS because he committed HMS to agreements in defiance of directions from HMS's board of directors. (Rec. Doc. 146-1, at 2). The Franco Parties respond that this claim for indemnity also fails because the jury found HMS to be at fault for detrimental reliance and breach of contract and because HMS failed to offer

11

evidence at trial of Franco's breach of fiduciary duty to justify the tort-based indemnification claim. *Id.* at 3. In reply, HMS reiterates its position that Harley Franco breached duties he owed to Conrad by failing to obtain financing, and that its entitlement to indemnification does not depend on whether Harley Franco breached his fiduciary duties to HMS. (Rec. Doc. 152, at 7-8).

"It has long been held in Louisiana that a party not actually at fault, whose liability results from the faults of others, may recover by way of indemnity from such others." *Martco Ltd. P'ship v. Bruks Inc.*, 430 F. App'x 332, 335 (5th Cir. 2011) (quoting *Bewley Furniture Co. v. Maryland Cas. Co.*, 285 So.2d 216, 219 (La.1973)). The obligation to indemnify can be contractual or implied, even in the absence of an indemnity agreement. *Nassif v. Sunrise Homes, Inc.*, 739 So.2d 183, 185 (La.1999). Because there is no indemnity agreement between HMS and the Franco Parties, HMS's indemnity claims are for implied indemnification.

Implied indemnity claims are equitable claims that arise only where "the liability of the person seeking indemnification is solely constructive or derivative and only against one who, because of his act, has caused such constructive liability to be imposed." *Martco*, 430 F. App'x at 335; *see also Nassif*, 739 So. 2d at 186 (holding that equitable principle of restitution applies in indemnity action to allow defendant to recover from the party actually at fault, even in absence of s contract of indemnification). Thus, a party who is actually negligent or at fault cannot recover implied indemnity. *Martco*, 430 F. App'x at 335 (citing *Hamway v. Braud*, 838 So.2d 803, 806 (La. App. 1st Cir. 2002)).

As explained above, the Court concludes that the VIA did not create the agency relationship between HMS and the Franco Parties. Further, the jury's finding that HMS itself was at fault for Conrad's detrimental reliance undercuts HMS's argument that it was without fault for breaching the contracts with Conrad—a requirement for implied indemnification. As the Court explained in its instructions to the jury, to prevail on a detrimental reliance claim, Conrad must prove that HMS made representations by conduct or word that Conrad justifiably relied upon, and that Conrad changed its position to its detriment. (Rec. Doc. 133, at 16). The jury, tasked with considering the evidence presented at trial, found that HMS, through its employees and representatives, made promises to Conrad that Conrad justifiably relied upon when deciding to build the vessels, and the reliance resulted in damages to Conrad. (Rec. Doc. 135, at 2). The jury's finding, that HMS's promises to Conrad caused damage to Conrad, necessarily demonstrates that HMS was actually at fault in forming and then breaching the contracts with Conrad. Thus, the jury findings demonstrate that HMS was not merely technically or constructively liable for Conrad's loss. HMS was actually at fault for the breach of contract and cannot recover implied indemnity from the Franco LLCs or from Harley Franco.

### III.   HARLEY FRANCO'S CLAIM FOR INDEMNIFICATION

The Franco Parties argue that, because HMS's indemnification claim cannot succeed, Harley Franco is entitled to mandatory indemnification pursuant to Washington statute and HMS's governing documents. (Rec. Doc. 146-1, at 2). HMS

13

contends that Franco is barred from obtaining indemnification because of its entitlement to a judgment against Franco. (Rec. Doc. 152, at 9).

Washington's Business Corporation Act states that, "unless limited by its articles of incorporation, a corporation shall indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which the director was a party because of being a director of the corporation against reasonable expenses incurred by the director in connection with the proceeding." Wash. Rev. Code Ann. § 23B.08.520. HMS's bylaws and articles of incorporation state that the corporation shall indemnify its directors and officers to the full extent permitted by the Washington Business Corporation Act, except in the case of (1) a final adjudication of intentional misconduct or knowing violation of the law, (2) a final adjudication related to unlawful distributions, or (3) a final adjudication that the director or officer personally received money, property, or services to which they were not legally entitled. (Rec. Doc. 146-1, at 24).

Because the Court concludes that HMS's claim against Harley Franco fails, HMS is obligated to indemnify Mr. Franco as a director of the corporation defending this proceeding because of his status as a director, unless one of the three exceptions in HMS's governing documents applies. HMS argues that the first and third exceptions apply because Harley Franco engaged in intentional misconduct and engaged in transactions from which he received a personal benefit to which he was not entitled. (Rec. Docs. 148, at 25, 152, at 9). However, the exceptions outlined in HMS's bylaws and articles of incorporation require "final adjudication" of that

14

misconduct, which did not occur in this case. Therefore, HMS must indemnify Harley Franco for his costs in connection with defending HMS's indemnification claim against him.

## CONCLUSION

To summarize the Court's findings and conclusions on the indemnity issues that were reserved to the court:

1. HMS must reimburse FM1 for the $2 million down payment to Conrad;

2. HMS is not entitled to indemnification from the Franco Parties (Harley Franco, FM1 or FM2); and

3. Harley Franco is entitled to indemnity from HMS for his successful defense of the third-party claim by HMS.

A final judgment will be issued on all claims in this case based upon the jury's verdict and the court's findings and conclusions on the indemnity issues.[6]

New Orleans, Louisiana, this 2nd day of February, 2023.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

---

[6] In light of these findings and the final judgment being issued,
  **IT IS HEREBY ORDERED** that the Franco Parties' *Motion for Indemnification* **(Rec. Doc. 146)** is **GRANTED**.
  **IT IS FURTHER ORDERED** that HMS's *Memorandum of Law Regarding Indemnification Claims* **(Rec. Doc. 148)**, which the court construes as a motion for indemnification, is **DENIED**.
  **IT IS FURTHER ORDERED** that Conrad's *Motion for Entry of Judgment under Rule 54(b)* **(Rec. Doc. 136)** is **DENIED as moot**.
  **IT IS FURTHER ORDERED** that the Franco Parties' *Motion for Entry of Interim Judgment* **(Rec. Doc. 145)** is **DENIED as moot**.